UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| EUGENE SCALIA, Secretary of Labor, United States Department of Labor,[1]<br><br>Plaintiff,<br><br>v.<br><br>SWEET LEMON, INC. d/b/a SWEET LEMONS THAI RESTAURANT, and PORNTHIP NEAMPONG,<br><br>Defendants. | Civil Action No. 1:20-cv-12217-RGS |

## DECLARATION OF KIMBERLY ERICKSON

I, Kimberly Erickson, declare pursuant to 28 U.S.C. § 1746 and under penalty of perjury that the following is true and correct:

1. I am employed as an Investigator in the Boston District Office of the Wage and Hour Division, United States Department of Labor.

2. My office address is 104 Dean Street, Room 201, Taunton, Massachusetts 02780.

3. As an Investigator, I investigate the wages, hours, and other conditions and practices of employment of employers and others subject to the various statutes that the Department of Labor enforces, including the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* (the "FLSA" or "Act").

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Secretary of Labor Martin J. Walsh is automatically substituted as the proper Plaintiff in this case. For ease of reference, the Secretary and his pertinent predecessors will be referred to herein as the "Secretary."

1

4.      In the course of my duties, I regularly review and transcribe information from employers' payroll records and records of hours worked, interview workers, and collect and review other relevant information.

5.      In August 2019, the Boston District Office opened an investigation under the FLSA, concerning the wage and hour practices of Sweet Lemon, Inc. d/b/a Sweet Lemons Thai Restaurant and one of its owners Pornthip Neampong (collectively, the "Employers").

6.      The period covered by the investigation was from November 12, 2016 to November 9, 2019 (the "Investigation Period").

7.      During the investigation, I gathered facts and documents.

8.      Certain employees cooperated or were about to cooperate with the Wage and Hour Division's investigation.

9.      During the investigation, I interviewed certain employees and obtained written statements from certain employees.

10.     In the course of the investigation, I learned through employee interviews that the employees worked for the entire period of their shifts and did not receive any breaks. Every employee who addressed the issue in interviews said that they did not have any break periods during their shifts.

11.     In the course of the investigation, I learned that the Employers did not keep accurate and adequate records of employees' hours worked or employees' rates of pay during the Investigation Period.

12.     The Employers' payroll documents were incomplete, as not all employees were included on the payroll documents. For at least one employee who was included on the payroll, the payroll documents underreported their hours worked and inflated their rate of pay. A true and

correct copy of the Employers' payroll documents for 2018, redacted to protect personal identifiable information, is attached hereto as Exhibit 1.

13. During the course of the investigation, the Employers provided me with handwritten documents concerning cash payments made to certain employees and the number of days each week those employees worked. True and correct copies of those documents are attached hereto as Exhibit 2.

14. Also during the course of the investigation, the Employers provided me with a handwritten document concerning the total monthly tips that Defendant Neampong had kept. A true and correct copy of that document is attached hereto as Exhibit 3.

15. Also during the course of the investigation, the Employers provided me with several documents signed by employees. The statements read in part: "I request my employer to pay me $12.00 an hour. I do not receive tips." True and correct copies of those documents are attached hereto as Exhibit 4.

16. As a result of the investigation, the Wage and Hour Division concluded that the Employers owe $130,018.33 in overtime compensation to 12 employees and an equal amount in liquidated damages, for a total of $260,036.66. The Wage and Hour Division also concluded that the Employers owe $29,880.98 in tips to six employees and an equal amount in liquidated damages, for a total of $59,761.96. A true and correct copy of the Wage and Hour Division's computations of the overtime back wages and tips that Defendants owe their employees is attached hereto as Exhibit 5.

17. To calculate the overtime back wages, I performed calculations on a workweek-by-workweek basis.

18. Since the Employers did not maintain records of the hours employees worked, to determine the hours worked by the Employers' employees on a workweek-by-workweek basis, I used the Employers' testimony concerning (a) the typical shift hours, (b) the typical number of days per workweek each employee worked, and (c) the typical days of the week each employee worked, in addition to certain documents the Employers provided to the Wage and Hour Division, including handwritten records of cash payments.

19. I had learned during the course of the investigation that employee Worawut Jala's weekly schedules differed substantially from the schedule Neampong stated that Jala worked during her deposition. For this reason, I used both the information concerning Jala's schedule that I had gathered during the investigation, including employee interviews, and the Employers' testimony concerning the number of hours per day employees worked to reconstruct Jala's hours worked.

20. Since the Employers did not maintain records of the cash wages that employees actually received and the Employers' payroll records were incomplete and inaccurate, to determine the total compensation that employees received on a workweek-by-workweek basis, I used the Employers' testimony concerning (a) the typical shift rates, and (b) the typical number of shifts per workweek each employee worked, in addition to certain documents the Employers provided to the Wage and Hour Division, including handwritten records of cash payments.

21. To determine the back wages owed to employees, I first divided the reconstructed total compensation the Employers paid to each employee for each workweek by the reconstructed hours that employee worked in the workweek to determine the employee's regular rate of pay for the workweek, per the governing regulations. For employees whose rate of pay fell below the Massachusetts state minimum wage in effect, I used the state minimum wage in

effect at the time as the employee's regular rate of pay in an overtime workweek, which is consistent with the Wage and Hour Division's practices and the governing regulation.

22. I then multiplied one-half each such employee's regular rate of pay by the number of hours worked over 40 to obtain the half-time overtime premium the Employers owe the employee for that workweek.

23. For employees whose rate of pay fell below the applicable regular rate (the Massachusetts state minimum wage) in effect during an overtime workweek, I also calculated back wages owed in an amount equal to the difference between the applicable regular rate in effect and the lower rate paid to the employee by multiplying that difference by the employee's total work hours, which is consistent with the Wage and Hour Division's practices and the governing regulation.

24. Using the above methodology, I calculated the following overtime back wage amounts for the following employees:

- Fredy Ramon Fuentes Alvarez—$28,672.50 in unpaid overtime premiums
- Marco Luna Arias—$4,963.00 in unpaid overtime premiums
- Warangtip Asci—$13,370.00 in unpaid overtime premiums
- Suchitra Chonglakmani—$21,852.00 in unpaid overtime premiums
- Worawut Jala—$2,777.63 in unpaid overtime premiums
- Charin Jiraratwattana—$16,872.95 in unpaid overtime premiums
- Hue Lam—$2,190.00 in unpaid overtime premiums
- Busada Samransook—$1,314.00 in unpaid overtime premiums
- Thita Sirisobhana—$2,899.50 in unpaid overtime premiums
- Wiyada Srisuwanporn—$764.50 in unpaid overtime premiums

- Nutcha Wongwutthiphat—$6,312.50 in unpaid overtime premiums
- Settawut Wongwutthiphat—$28,029.75 in unpaid overtime premiums

25. To compute the estimated amount of tips withheld by the Employers, I used $350.00 per week, the midpoint of Neampong's approximation of her weekly tips, as the amount of tips that Neampong directly received from customers for her work as a server.

26. The Wage and Hour Division multiplied $350.00 per week by four workweeks per month to estimate that Neampong directly received tips totaling $1,400.00 each month from customers for her work as a server.

27. For the period from April 2018 onward, the Wage and Hour Division first subtracted $1,400.00 per month from each month's total tip amounts, as reported by the Employers, to allow Neampong to keep the tips she directly received from customers for her work as a server.

28. The Wage and Hour Division divided the remaining tips for each month from April 2018 onward by the total number of hours worked by servers in the workweeks of that month to compute an hourly tip amount for each month.

29. The Wage and Hour Division then multiplied the particular month's hourly tip amount by the number of hours a server worked in a workweek of that month to estimate the amount of tips the server had received from customers in that workweek.

30. Using the above methodology, I calculated that Defendants owe the following employees the following tip amounts:

- Warangtip Asci—$8,180.78 in withheld tips
- Suchitra Chonglakmani—$8,767.72 in withheld tips
- Worawut Jala—$5,497.88 in withheld tips

- Hue Lam—$1,615.64 in withheld tips

- Kawinaratt Runruengthitikul—$2,225.60 in withheld tips

- Nutcha Wongwutthiphat—$3,593.36 in withheld tips

Executed on this <u>10 </u>th day of December, 2021.

<u>/s/ Kimberly Erickson</u><br>Kimberly Erickson