# EXHIBIT 3

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

+ + + + +

_____
                                  :
IN THE MATTER OF:                 :
                                  :
EUGENE SCALIA, Secretary of       :
Labor, United States             :
Department of Labor,              :
                                  :
          Plaintiff,              :
                                  :
     v.                           : Civil Action No.
                                  : 1:20-cv-12217
SWEET LEMON, INC., d/b/a          :
SWEET LEMONS THAI                 :
RESTAURANT, and PORNTHIP          :
NEAMPONG,                         :
                                  :
          Defendants.             :
                                  :
_____:

          Friday,

          August 27, 2021

DEPOSITION OF:

               PORNTHIP NEAMPONG

called for examination by Counsel for the Plaintiff, pursuant

to Notice of Deposition, via Videoconference, when were

present on behalf of the respective parties:

APPEARANCES:


On Behalf of Agency:


EMILY V. WILKINSON, ESQ.

U.S. Department of Labor

Office of the Solicitor

John F. Kennedy Federal Building

Room E-375

Boston, Massachusetts 02203

617-565-2532

wilkinson.emily.v@dol.gov



On Behalf of Defendants:


JACK P.  MILGRAM, ESQ.

Law Offices of Jack P. Milgram

21 Mayor Thomas J. McGrath Highway

Suite 203

Quincy, Massachusetts 02169

617-227-0878

jackp.milgram@verizon.net

CONTENTS

WITNESS                    DIRECT CROSS REDIRECT RECROSS


Pornthip Neampong      6


EXHIBIT NO.                                     PAGE

1    Topics for Examination. . . . . . . . . . . . . . 12

2    Answer to DOL Interrogatories . . . . . . . . . . 28

3    Employee Time Sheets. . . . . . . . . . . . . . . 32

4    List of Complainants. . . . . . . . . . . . . . . 41

5    Employee Time Sheets. . . . . . . . . . . . . . . 51

6    Sweet Lemon Payroll Records . . . . . . . . . . . 55

7    Sweet Lemon Payroll Records . . . . . . . . . . . 60

8    Record of Employee Tips . . . . . . . . . . . . . 67

9    Tips turned over to Investigator. . . . . . . . . 73

1    Kawinaratt's name at the top of the page.  Is that right?

2    A    Yes.

3    Q    So Exhibit 3 only refers to five employees.  Right?

4    A    Are you asking that we have the total employee

5    working only five?

6    Q    No.  I'm asking that whether it's true that Exhibit

7    3 only refers to five employees.  We just counted five

8    employees together in Exhibit 3, so I'm just asking whether

9    those are the only employees whose names are in Exhibit 3.

10   A    Yeah, you're right.  I don't know the rest of the

11   other employees.

12   Q    But Sweet Lemon did have more than five employees.

13   That's right, isn't it?

14   A    That's correct, also.

15   Q    Does Sweet Lemon have any time records besides the

16   ones in Exhibit 3?

17   A    I did send over to your Department.

18   Q    These are the only -- no need to translate that.

19        So Sweet Lemon cannot know for sure how many hours

20   employees worked, because no contemporaneous time records

21   were maintained each  week.  Is that true?

22   A    You might be correct, because we did not -- prior

23   to the investigation we did not keep the records.  But we

24   know the working hours of each individual employee who start

25   to work and end of the work, and so we know about is that end

1    time and then we do not have too many customers.

2        Q    How did Sweet Lemon decide how much to pay

3    employees if no contemporaneous time records were maintained?

4        A    It's up to the demand and agreement.  When we offer

5    and we agree that we pay $100 each day to that particular --

6    or to each individual employee, or $110, they say happy and

7    they accept it.

8        Q    And so I think I remember you saying that you paid

9    $100 a day to the servers.  Is that right?

10       A    The employees were satisfied and happy as long as

11   they get paid $100 a day because when there's not much tips

12   and they're happy.

13            MS. WILKINSON:  Sorry.  Was that, there weren't

14   many tips.  Is that what you said?

15            THE INTERPRETER:  Yes, that that's no much tips.

16            BY MS. WILKINSON:

17       Q    But the $100 per day rate was for servers.  Is that

18   right?

19       A    Yes.

20       Q    And the $110 per day rate was for employees worked

21   in the kitchen.  Is that right?

22       A    Yes.

23       Q    And were servers paid $100 a day from November 2016

24   all the way to November 2019?

25       A    Yes.

1      Q      And were kitchen workers paid $110 per day from

2    November 2016 all the way through to November 2019?

3      A      As a matter of fact, during November of '16 we paid

4    the employees in the kitchen $100 and later on we increased

5    to $110.

6      Q      Okay.  Do you remember when you increased to $110

7    a day for the kitchen workers?

8      A      I'm sorry, I cannot remember.

9      Q      Do you have a general memory of maybe the year when

10   that happened?

11     A      I estimate but I do know for sure that I start to

12   pay them in 2017 and 2018 but maybe the end of '16.

13     Q      Okay.  Please explain how Sweet Lemon paid

14   employees up until the time you learned of the investigation.

15     A      The employees got paid weekly.

16     Q      And were the employees paid in cash?

17     A      I pay them cash.

18     Q      Did you pay all of the employees in cash?

19     A      Yes.

20     Q      After you learned about the investigation, did

21   anything change in the way that Sweet Lemon paid employees?

22     A      After the investigation, then we start to pay the

23   employees every two weeks and by check.

24     Q      And did you put all of the employees on your

25   payroll after you learned about the investigation?

1    employees by payroll check?

2        Q    No.  I'm sorry, my question is probably  not clear.

3    I will try to make it clearer.

4            Did you take any steps before the investigation to

5    determine whether your overtime pay practices complied with

6    the Fair Labor Standards Act?

7        A    I did not take any steps to do that.  And then as

8    I mentioned to you, Counsel, that I agree with the employees

9    amount of daily pay.

10       Q    You agree with what the employees -- I'm sorry.

11   Could you explain that last part, what do you mean by you

12   agree with the employees' daily pay?

13       A    When they start to come in and they ask for $100 a

14   day.

15       Q    You mean you agreed to pay them $100 a day.  Is

16   that what you're saying?

17       A    Yes, that's correct, because I can afford to pay

18   them.

19       Q    Did you take any steps before the investigation to

20   determine whether Sweet Lemon's practices of keeping

21   employee's tips complied with the Fair Labor Standards Act?

22       A    The employees are not interested in the tips money.

23   They're happy with the daily pay of $100 per day because the

24   tip money is not much.

25       Q    But did Sweet Lemon take any steps to determine

1    whether keeping employees' tips complied with the Fair Labor

2    Standards Act?

3         A    My understanding is that the tips earner has to pay

4    tax.  So that's the reason I keep the tips so I have to pay

5    tax.

6         Q    I understand that.  That's not my question, though.

7              So my question is, I know that you kept all the

8    tips the employees earned.  Did you ever take any steps

9    before the investigation to determine whether that practice

10   of keeping tips complied with the Fair Labor Standards act?

11        A    Since the employees are happy with $100 per day

12   pay -- and the tip money is nominal so they're not interested

13   in that.

14        Q    I'm sorry.  I'm not asking about whether the

15   employees were happy or whether you agreed to pay them $100

16   a day.  Did you ever ask your accountant whether you were

17   allowed to keep the employees' tips under the Fair Labor

18   Standards Act?

19        A    I did not ask my accountant.

20        Q    Did you ever ask an attorney that?

21        A    I did not ask either.

22        Q    Did you ever read any resources from the Department

23   of Labor about tip practices?

24        A    No, I have never read.

25        Q    Did you ever ask your accountant whether your

1  overtime pay practices complied with the Fair Labor Standards

2  Act?

3      A    No, I have never asked my accountant.

4      Q    And did you ever ask an attorney that?

5      A    No, no.

6      Q    And did you ever read any resources from the

7  Department of Labor about the overtime pay practices that

8  comply with the Fair Labor Standards Act?

9      A    No.

10     Q    And did you ever consult with anyone else about

11 your compliance with the Fair Labor Standards Act and Sweet

12 Lemon's compliance with the Fair Labor Standards Act?

13     A    No, I have never consult with any expert or

14 specialist because we work and we don't have any problem with

15 the employees.

16          MS. WILKINSON:  Okay.  I think maybe it's a good

17 time to take a lunch break.  Is 45 minutes enough time for

18 lunch?

19          MR. MILGRAM:  It's five past 1:00 so why don't we

20 say two o'clock.

21          MS. WILKINSON:  All right.  Two o'clock sounds

22 good.

23          THE INTERPRETER:  What time is it now?

24          MS. WILKINSON:  Right now it's 1:05 our time.

25          THE INTERPRETER:  So I come back at two o'clock.

1    So about an hour?

2         MS. WILKINSON:  Yes.

3         THE INTERPRETER:  Okay.  Thank you.

4         MS. WILKINSON:  Thank you.  And Ms. King, we'll go

5    off the record.

6         (Whereupon, a recess was taken.)

7         MS. WILKINSON:  Let's go back on the record.

8         BY MS. WILKINSON:

9    Q    Ms. Neampong, Sweet Lemon did not include all of

10   its employees on its payroll records.  Is that right?

11   A    Correct.

12   Q    And Sweet Lemon paid all employees in cash, you

13   said earlier.  Is that right?

14   A    Yes.

15   Q    And when Sweet Lemon paid all of its employees in

16   cash did those cash payments include any overtime premium for

17   hours worked over 40 hours in a work week?

18   A    We do not pay overtime and we just pay  just by

19   weekly or by the whole day of work.

20   Q    And so you did not pay any employees any overtime

21   pay until you found out about the investigation.  Is that

22   right?

23   A    Correct.  I did not pay the employees overtime

24   because as I indicated to you, Counsel, they have a period

25   between 3:00 to 5:00 p.m. that we didn't have work.

1    in December of 2016?

2        A    No.

3        Q    So no employees that Sweet Lemon employed in

4    December of 2016 worked for more than 40 hours each week?

5        A    As I already told you, Counsel, that they have the

6    break period 3:00 to 5:00 p.m.

7        Q    So I'm talking about December 2016, and you

8    testified that you did not start the break period until after

9    the investigation began.  So do you understand that time

10   period, December 2016?

11       A    Yes, I understand your question.

12       Q    Okay.  And so in December of 2016, did any

13   employees work more than 40 hours each week?

14       A    No, because during that 3:00 to 5:00 I do not

15   impose on the employees and we did not have a lot of orders

16   coming in.

17       Q    But some orders come in between 3:00 and 5:00

18   p.m. -- I'm sorry, let me rephrase that.  But some orders did

19   come in between 3:00 and 5:00 p.m. during the period of

20   December 2016?

21       A    Yes.

22       Q    And if an order did come in between 3:00 and 5:00

23   in December 2016, Sweet Lemon expected that the employees

24   would cook the food and serve the food.  Is that right?

25       A    Correct.

1  this Exhibit 6.  And so this is April -- well, I'll ask.

2          What date for the payroll records is shown on page

3  16 of Exhibit 6?

4      A    April 2018.

5      Q    Okay.  And so Aroon Neampong is not on this payroll

6  record.  Is that right?

7      A    Correct.

8      Q    And why was he taken off the payroll?

9      A    At that time he was sick.

10     Q    Okay.  In April of 2018 what was Kawinaratt's

11 position at Sweet Lemon?

12     A    She worked as a waiter and also server sometimes.

13     Q    And what was Settawut's -- I'll actually just,

14 Settawut, S-E-T-T-A-W-U-T -- the question, sorry, is what was

15 Settawut's position at Sweet Lemon in April of 2018?

16     A    He worked in the kitchen.

17     Q    And you estimated that you had eight employees at

18 Sweet Lemon at this time.  Is that right?

19 **CONFIDENTIAL--SUBJECT TO PROTECTIVE ORDER**

20

21         MS. WILKINSON:  Off he record, please.

22         (Off the record.)

23         MS. WILKINSON:  Back on the record, please.

24         I'll again mark the portion of the testimony

25 immediately preceding going off the record as confidential

1    and subject to the entry of a protective order in the future.

2              BY MS. WILKINSON:

3         Q    So at this time, Ms. Neampong, you were  paying --

4    you said that you were paying the servers or waiters a daily

5    rate of $100.  Is that right?

6         A    Correct.

7         Q    So why does it say here that Kawinaratt, who was a

8    waiter, was making $12 per hour?

9         A    Actually, Kawinaratt is the son of  -- Kawinaratt

10   is the daughter of Miss Charin.  And Miss Charin is one of

11   the partners of the restaurant and she request to place hour

12   pay $12 on the record.

13        Q    But Kawinaratt was not paid $12 per hour.  Is that

14   right?

15        A    But as a matter of fact, Miss Kawinaratt was paid

16   $12 an hour.

17        Q    But I thought Kawinaratt was paid $100 per day like

18   the other servers.  Is that right?

19        A    Normally the employees who work daily  at the

20   position was paid $100 per day but Miss Kawinaratt she is

21   special because she's the daughter of the partner.  So we pay

22   Miss Kawinaratt $12 an hour.

23        Q    Was Kawinaratt paid in cash?

24        A    I paid her by check.

25        Q    Before you testified -- earlier you testified that

1    all employees were paid by cash, so I'm a little confused

2    now.  So did you pay all employees by cash each week?

3         A    I want to elaborate on this.  The cash paid to the

4    employee is paid weekly or the payroll check will be paid.

5    And the employee who received the payroll check, he returned

6    the check back to the restaurant and the restaurant give him

7    or her the cash.

8         Q    Okay.  And so here it says that Settawut was paid

9    $11 per hour, but Settawut was actually paid a daily rate.

10   Is that right?

11        A    That's correct.

12        Q    Okay.  And now -- so here it says that you received

13   $3,342.65 in tips.  Is that right?

14        A    Yes.

15        Q    And were any of those tips earned by other

16   employees other than you?

17   CONFIDENTIAL--SUBJECT TO PROTECTIVE ORDER

18

19

20

21             MS. WILKINSON:  Let's go off the record, please.

22             (Off the record.)

23             MS. WILKINSON:  And back on the record, please.

24             Ms. Neampong's answer to my last question will

25   remain confidential -- I'll designate that as confidential

1    and subject to the entry of a future protective order.

2              BY MS. WILKINSON:

3         Q    So the $3,342.65 that it says that you  earned in

4    tips includes amounts earned by other employees.  Right?

5         A    I believe that belonged to a cook, to all the

6    workers, and belonged to the restaurant.

7         Q    And so it says here -- so Kawinaratt was a

8    waiter -- waitress.  Is that right?

9         A    Yes.

10        Q    And so it doesn't say that Kawinaratt received any

11   tips from customers here.  Why not?

12        A    Miss Kawinaratt preferred to be paid  like $100 a

13   day and it did not cover the amount per day for her.

14             MS. WILKINSON:  So I'm sorry, I'll wait till Mr.

15   Milgram's back.

16             MR. MILGRAM:  I'm back.

17             BY MS. WILKINSON:

18        Q    Ms. Neampong, I would ask that you don't look at

19   any documents other than the one that I'm showing on my

20   screen.

21        A    Yes.

22        Q    Okay.  So now I'd like to just ask this question

23   again.

24             So you just said that Kawinaratt was paid $100 a

25   day, but on page 16 of Exhibit 6 it says that she was paid

1    $12 an hour.  So which is the correct amount?

2         A    I believe that Miss Kawinaratt was paid $100 a day.

3    And I sent it over to the accountant and somehow they put

4    down the amount that appears $12 an hour.

5         Q    Okay.  So the $12 an hour rate shown for Kawinaratt

6    here is not accurate?

7         A    I'm not certain, Counsel.

8         Q    Was Kawinaratt paid $100 per day?

9         A    Yes, that's correct.

10        Q    So did customers give -- so when Kawinaratt waited

11   on tables at the restaurant in April of 2018, did customers

12   leave tips for Kawinaratt?

13        A    Yes, I believe that she might have received the

14   tips but she had to gather the tip money and put inside a

15   box.

16        Q    Is that what all the servers had to do, the waiters

17   and waitresses?

18        A    Yes, that's correct.

19             MS. WILKINSON:  Okay.  So now I want to turn to

20   Exhibit 7, which you also have.

21                  (The document referred to was

22                  marked for identification as

23                  Exhibit 7.)

24             BY MS. WILKINSON:

25        Q    So can you just look through -- there are six pages

1    of Exhibit 7, so please look through those and let me know

2    when you're done.

3         A    Yes.

4         Q    Are you ready?

5         A    Yes.

6         Q    Okay.  Do you recognize Exhibit 7?

7         A    Yes.

8         Q    And what is Exhibit 7?

9         A    The hours that we paid to the employees daily.

10        Q    And who created this document that's Exhibit 7?

11        A    I, myself.

12        Q    And when did you create it?

13        A    After they asked for the information.

14        Q    So you didn't keep records of the cash payments to

15   employees at the time when you actually made those payments.

16   Am I understanding that correctly?

17        A    Yes.  I just paid the employee weekly.

18        Q    So this document was made during the investigation.

19   Is that right?

20        A    Yes.

21        Q    Okay.  I'm sorry, I didn't ask that question very

22   clearly.

23             So was Exhibit 7 created by you after you found out

24   about the investigation?

25        A    Yes, yes.

1    Q    And so it was based on your memory of how much you

2    paid these employees each week in cash.  Is that right?

3    A    Yes.

4    Q    Okay.  So we'll just look at this first page here -

5    - actually, let's look at page 5.  And so what is the number

6    that is -- so we're looking at page 5 of Exhibit 7, and what

7    is the number that is circled in each of these rows?

8    A    The circle of the number -- the number inside the

9    circle represent the days of the work for each week.

10    Q    Okay.  So if there's a six circled, that means that

11    Settawut worked six days that week.  Is that right?

12    A    That's correct, Counsel.

13    Q    And then what is the number next to the number in

14    the circle?

15            THE INTERPRETER:  Counsel, are you asking the one

16    in the middle or the one on the side to the right?

17            MS. WILKINSON:  Sorry.  I'll re-ask the question.

18    Thank you.

19            BY MS. WILKINSON:

20    Q    What is the number directly to the right of the

21    number in the circle?

22    A    That's also the number of days of work each week.

23    Q    So let's look at this first one here.  So the six

24    in a circle and then what does the number right next to the

25    six represent?

63

1      A    The six in the circle that means the amount of the

2  pay.

3      Q    So if we look here, in the top left-hand corner of

4  these records in 2017, it means that Settawut worked six days

5  that week and received $510 in cash.  Is that right?

6      A    Yes, that's correct.

7      Q    So each circle with a number, right to the right of

8  that circle that represents one week.  Is that right?

9      A    Yes.

10      Q    Is everything in this document true and accurate to

11  the best of your knowledge?

12      A    I believe it is accurate.

13      Q    And so we saw that Settawut was also  included in

14  the payroll documents that we just looked at.  Remember?

15      A    Yes.

16      Q    So Settawut was paid in cash at the end of each

17  week and also paid by a payroll check that Settawut had to

18  return to the restaurant.

19      A    Yes.  When he received the payroll check, then he

20  returned the payroll check in exchange for the cash weekly.

21      Q    Okay.  So which document contains the accurate

22  amount that Settawut was paid?  Is it the payroll records

23  that we looked at in Exhibit 5 and Exhibit 6, or is it

24  Exhibit 7 that we're looking at right now?

25      A    I admit that I made some mistakes because when I

1    put down the amount on the payroll sheet, Exhibit 5 or 6,

2    lower from the actual amount indicated in Exhibit 7.

3         Q    Okay.  So the payroll records show an amount that's

4    lower than what's in Exhibit 7.  Am I understanding that

5    correctly?

6         A    That's correct.

7         Q    And did you do that because Settawut was working

8    more than 40 hours each week?

9         A    Correct.

10        THE INTERPRETER:  This is the interpreter speaking.

11   Can I ask her to clarify because she said correct and then

12   she mentioned a conflict.

13        MS. WILKINSON:  Okay.  I will ask a new question.

14   Yes.

15        BY MS. WILKINSON:

16        Q    Did you include a lower amount on the payroll

17   records for Settawut than what you've included in Exhibit 7

18   because Settawut was working more than 40 hours a week?

19   **CONFIDENTIAL--SUBJECT TO PROTECTIVE ORDER**

20

21

22        MS. WILKINSON:  I'll go off the record for a

23   second.

24        (Off the record.)

25        MS. WILKINSON:  Back on the record.

1           I'd like to designate Ms. Neampong's immediately

2     preceding answer before we went off the record as

3     confidential and subject to the future entry of a protective

4     order.

5           Just one moment.

6           (Pause.)

7           BY MS. WILKINSON:

8     Q    So Ms. Neampong, is it fair to say that Settawut

9     worked more than 40 hours in a work week?

10    A    Yes.

11    Q    And you didn't include information on the payroll

12    documents about -- to show that employees worked more than

13    40 hours a week.  Is that right?

14    A    Correct.

15          MS. WILKINSON:  Let's take just a ten-minute break.

16    I have probably about maybe an hour left but no more than

17    that, I don't think.  Is that okay with everyone?

18          THE INTERPRETER:  Yes.

19          MR. MILGRAM:  Sure.

20          MS. WILKINSON:  So let's take a ten-minute break,

21    come back at 3:25.  Thanks.

22          (Whereupon, a brief recess was taken.)

23          MS. WILKINSON:  Let's go back on the record.

24          BY MS. WILKINSON:

25    Q    So, Ms. Neampong, just showing you again Exhibit 7,

1          A     Yes.

2          Q     Okay.  You're ready?

3          A     Yes.

4          Q     Okay.  Do your recognize these documents that are

5     Exhibit 8?

6          A     Yes.

7          Q     And what are these documents that are Exhibit 8?

8          A     It's a document indicating that the worker who

9     worked for the restaurant.

10         Q     Okay.  And so, I'm sorry, I didn't have this

11    document up on my screen before.  It's Exhibit 8, but let me

12    just ask the question again.

13               What are the three pages of Exhibit 8?

14         A     These are the documents that I consult with my

15    accountant that prepare that.  Each individual employee

16    agreed not to receive the tips but agreed to accept the

17    amount of daily pay.

18         Q     And why did -- so who prepared the typed part of

19    Exhibit 8?

20         A     I talked over to my accountant and explained that

21    the employees agreed not to receive the tips money, so that's

22    why the accountant prepared this document.

23         Q     And did you ask the employees to sign these

24    documents that are Exhibit 8?

25         A     Yes, because that individual employee agreed to

1   accept the daily amount paid.

2        Q    And when did you ask the employees to sign these

3   documents that are Exhibit 8?

4        A    Right after the investigation.  Right after they

5   come to investigate.

6        Q    And this is not true -- the information included in

7   the typed part of the documents in Exhibit 8 is not true.

8   Right?

9             Employees did receive tips, they just weren't

10  allowed to keep them.  Do I have that correct?

11       A    All the employees did not dispute about the tip

12  amounts.  They agreed to collect the tip and put in the box.

13  They did not demand for it.

14       Q    But they did -- customers did give the waiters and

15  waitresses tips.  Right?

16       A    Yes.  Then the waiters and waitresses, they collect

17  the money and put in the box.

18       Q    And then Sweet Lemon kept all the tips that the

19  waiters and waitresses received.  Right?

20       A    Yes, they all agreed and the amount of the tips

21  collected is not a big amount.

22       Q    And you were the person who kept all those tips.

23  Right?

24       A    Yes.

25       Q    And you kept all the tips from -- did you ever

1    estimate.

2            I understand you probably don't know the exact

3    amount.  Again all from memory.  I don't want any information

4    from documents.

5        A    I will estimate that I kept the tip money, about

6    $2,000 or a little bit over $2,000 a  month.

7        Q    And did you record the amount in any way at the

8    time when you actually were keeping those tips?

9        A    I did not record it myself, but I wrote it down and

10   sent the number to my accountant.

11       Q    And did you keep track of which servers received

12   the tips from customers?

13       A    No, I don't have any record.

14       Q    You said before that you did some work as a

15   waitress in the restaurant.  Is that right?

16       A    Are you asking prior to selling the business or as

17   of now?

18       Q    Yes.  From November 26 -- sorry -- from March 23,

19   2018 to the time when you sold the business.

20       A    Are you asking whether to not I received the tips?

21       Q    No.  What I'm asking -- so you worked as a waitress

22   during that time from March 23, 2018, till the time you sold

23   the business. Is that right?

24       A    Yes, because during that period then the COVID

25   striked.

1    MS. WILKINSON:  I'm sorry, I didn't understand that

2  one.

3    THE INTERPRETER:  During that period,  then the

4  COVID pandemic occurred so we don't have too much business.

5    BY MS. WILKINSON:

6    Q    But you did work as a waitress at some points in

7  time.  Am I right?  That's all I'm asking.

8    A    Yes, I worked in the front and in the back in the

9  kitchen.

10    Q    Okay.  And so you had a lot of different

11  responsibilities at the restaurant before you sold the

12  business?

13    A    Yes.

14    Q    About how much of your time did you spend working

15  as doing waitress duties before you  sold the business?

16    A    Two or three years prior to the selling of the

17  business.

18    Q    And about what percentage of your time would you

19  say that you were doing waitress duties before you sold the

20  business?

21    A    I would estimate about 50 percent of the time that

22  I spent.

23    Q    And so I'd also like you to estimate about many

24  dollars per week you earned from customers as tips that were

25  directly because you served that table as a waitress.

1       A     You asked me to give you an estimation of the

2    weekly tips that I earned.  I will tell you that not much,

3    approximately three to four hours -- $300 or $400 a week.

4              MS. WILKINSON:  Okay.  I'm going to show you

5    Exhibit 9 now, and I believe you also have a copy of this.

6                    (The document referred to was

7                     marked for identification as

8                     Exhibit 9.)

9              BY MS. WILKINSON:

10      Q     So it's only one page, so please let me know when

11   you're ready to talk about it.  Are you ready?

12      A     Yes, I'm ready.

13      Q     Do you recognize this document that's Exhibit 9?

14      A     Yes.

15      Q     And what is Exhibit 9?

16      A     This document is a presentation of the amount of

17   the tips that I handed to the investigating officer.

18             MS. WILKINSON:  I'm sorry.  I didn't understand the

19   last word.

20             THE INTERPRETER:  I hand it to the investigating

21   officer.

22             BY MS. WILKINSON:

23      Q     Okay. And did you create this document?

24      A     Yes.

25      Q     And when did you make this document?

74

1          A     After the investigation, approximate in 2019.

2          Q     So you gave it to the investigator during the

3     investigation.  Is that right?

4          A     Yes.  I sent it to him or her and the amount of

5     money from the tips.

6          Q     Is this the same document that you gave to your

7     accountant with the amounts of tips that you collected from

8     the employees?

9          A     Yes, I think that the amount of the tip that I

10    charged to my accountant -- these are also including the tips

11    from the to-go orders.  But I don't know whether or not it's

12    considered the amount of the tips that you referred to.

13         Q     So this is not the same document that you gave to

14    your accountant?

15         A     I'm not certain, but it might be the amount that I

16    sent over to my accountant.

17         Q     But you made this document to give to the

18    investigator.  Right?

19         A     Yes, yes.

20         Q     And so is this -- are these amounts split out by

21    month?

22         A     Yes.  This is for monthly tips.

23         Q     So the first number is that the amount -- the first

24    number in each column with the year at the top, does that

25    number represent the amount of tips that you kept, for

1    example, in January?

2         A    Yes, that's correct.

3         Q    And how did you come up with these amounts when you

4    made this document for the investigator?

5         A    This amount represents the number daily that I sent

6    to my accountant.

7         Q    The daily amount or is it the monthly amount?

8         A    The first number, the 3,576, that's the monthly

9    tip -- the amount that I sent it to my accountant monthly,

10   not daily.

11        Q    Monthly.  Okay.  So this is one month -- sorry --

12   $3,576.59 is one month, and then the next month is $3,471.85.

13   Correct?

14        A    Yes, that's correct.

15        Q    So I'm just going to go back to Exhibit 2 and I'm

16   going to go to page 2 of that document.  Page 2 of Exhibit

17   2.  And I'm going to read the answer to interrogatory number

18   6.

19             "To the best of our knowledge, the payroll records

20   submitted to the U.S. Department of Labor during the

21   investigation may have overstated, but do not understate the

22   number of hours worked by all employees for each pay period

23   therein."

24             Did I read that correctly?

25        A    I don't fully quite understand the content of the